Our last case for argument this morning is Quake v. Lo, case number 18-1779. Mr. Reines, you reserve three minutes of your time for rebuttal, correct? Yes, thank you, Your Honor. Okay, you may proceed. Thank you, Your Honor. Ed Reines on behalf of Professor Stephen Quake and Christina Phan. Although the board correctly followed this court's instruction and guidance and came to the conclusion that random DNA sequencing was a molecular counting method, even a chromosome counting method, disclosed in the patent in columns 19 and 20, it legally erred by fundamentally getting the law wrong. How did that happen? The court decision turned on its conclusion that this case was like Senecor and Lilly where there was just a wish, that it was a wish for Quake and Phan to think that you could use random DNA sequencing as the chromosomal counting method for the invention. And that's completely lacking in the record. The technology was disclosed in 2003. There were products in the market. That's all in the patent application. It's in the definition, agreed upon definition of skill in the art, was that the person's skill in the art in their basic competency would know random sequencing. So the idea that this was a new technology is just a factually false statement. They don't even cite anything. The board doesn't. So it just goes way off. And then what they do is they use that analogy to Senecor and Lilly. By the way, Senecor and Lilly, we're talking about edge biotech cases where they don't even know if the molecule's going to exist. It's totally speculative. The idea that when Quake says, here, I'm going to show you how my invention works, this is a brilliant invention of rather than trying to separate maternal DNA and fetal DNA, you put them together for 10 years low, and everyone else was trying to separate them. So, Mr. Reines, when we look at Claim 1 of the 18th patent, and we look at paragraphs A, B, C, and D, the way I understand that, in my view anyway, one of the primary issues here in your case is that there's something missing between C and D, and that would be something in the normalization of data. There's something missing. It says using the data of Step C, and looking at Step C, it's just identification with chromosomes. There's nothing else there. Your Honor, I look at it differently. I think it's really in D is you do what's obvious. So you have ways to count chromosomes, and in any method, you have to normalize because you're going to get more hits from chromosome 21 if it's big than chromosome 20. So your argument is that since normalization was well known and understood, that a procedure would probably know that, that still doesn't excuse a total absence or lack of disclosure of normalization in the patent, does it? It totally does because normalization is not required. How can it? That means that instead of reviewing the patent, let's just see what the procedure knows. The patent has a purpose for disclosure. There's a purpose for written description. How does a written description here assist you with respect to normalization of data? Okay, good question. The answer is in looking at a written description issue, you have to look at the nature of the invention and the predictability of the art. And so the idea is, is it a speculative thing? Is it just an inventor saying, well, let's create fusion or something like that? Or do they possess the invention? Here the invention, and this is what I was getting to a moment ago, was you don't separate the maternal and the fetal DNA. No one ever did that. Everyone was trying to divide it. There's nothing in this record that anyone ever did that before Professor Quake's major invention. That's at issue here. No one ever did that. He said, I'm showing you how you do it with digital PCR. Admit it. He laid it out chapter and verse. He spent a lot of time. And then he said, and this is, I think, as shown by the table of contents for the application, there's a variety of ways where you can do the chromosome counting. You can do chromosome counting this way. You can do chromosome counting that way. You can use DNA sequencing. Two columns worth referenced to commercial products. Now the point being that if it's mundane test technology that's within the basic competency, like you count chromosomes by reference to the product and the patent application from five, seven years earlier, whatever it is, the 2003 application. No one's saying that there's anything inventive about how you do step D. The question is, step D requires you take the number of hits you've got for chromosome 21, the suspected aneuploidy, and the number of hits you've got for chromosome 20, and you compare them. If you've got more 21, uh-oh, you may have Down syndrome, baby. So step D is a comparison step? Between the suspected aneuploidy and not. Step C is identification step. What's missing here, and this is what I'm trying to get you to focus on, is the normalization of data step, and with respect to massively parallel sequencing. But that's an implementation detail, which is the other side calls it a detail. In their appellate brief, they call it a detail normalization, Your Honor. It's part of step D's statistical of how you do it. It's not a separate step. My question is, I think, similar, but I mean, phrased a little bit differently. If everything you're talking about in this specification is largely devoted to targeted sequencing, you may dispute that, but I just take that as it. But I think that was the last Federal Circuit decision. Well, it is, but it isn't. Because the problem is you've shown all these steps to do targeted sequencing, and I may be getting the science wrong. It's digital PCR. Let me finish. If you don't have to do this kind of normalization when you have targeted sequencing, there's no reason for the specification to claim it. I get that the normalization process we're talking about is well known in the art, but if it's not in the specification, why doesn't that still lead to the conclusion that the only thing the written specification supports overall is targeted sequencing? Because it's an implementation detail of how you do the comparison. You have to do statistical analysis, whether you're using targeted sequencing, which isn't disclosed in this patent application, or digital PCR, which is the main embodiment. I think that's what Your Honor was referring to. In all of those, you have to do all kinds of statistical analysis. It's in the patent. The t-test, the student t-test, everyone has to do that. The point is, would a person of skill in the art looking at this think that this patent application discloses the use of random sequencing as the chromosome counting method for the invention? And there's no way in the world they wouldn't. It says one way to use the invention is to use random DNA sequencing. So they clearly would know that that's being attempted. Well, where does it say one way to do the detection of aneuploidy is through random DNA sequencing? I think that's the rub. If it said that, then we wouldn't be kind of on our hands and knees trying to hunt for clues to find and locate this second method that you're now claiming. Right. Let's see if I can give you a way to do that, which is at 19, column 19, at the part that was quoted by this court in its last decision, at line 59, it states a methodology useful in the pleasant invention platform is based on massively parallel sequencing random. Then it goes on, and then it sends you to the Illuminate, and then it sends you to the Ballisubramanian. And it says one way to do the invention, a methodology, is to use random sequencing. And then continuing to the next paragraph, it says, and then the way you count the chromosomes is use 30 BP of random sequence information. Where are you, Mr. Reinesen? What's that? Where are you? In the next paragraph. Well, this is at 20 at line 7. Which column? 20 at line 7. Okay. That's the second. So it says for the invention, I mean, look, we're going to lose the appeal if you don't accept that it's saying you can use DNA sequencing as the chromosomal counting method. That's what columns 19 and 20 say. That's what was decided in the last appeal. That's what even the board had to agree to. The issue is if you have counted the chromosomes, would you know to compare the one you suspect is aneuploid with a control or not? Yes, you would. That's why they don't argue it, and that's why the board didn't say it doesn't disclose the general comparison. The general comparison is step D. Now, there is no statement of that specific as an example. So that's what I'll agree. There is not an embodiment where they lay out, these are the statistical analyses you would do to compare the suspect aneuploidy to the control. That doesn't exist in here. But it does disclose the use of the comparison of the control versus the aneuploid. It's not that complicated. And then how you do that, people would know. So people wouldn't say, well, they don't own it because they didn't tell us how you do that comparison. When it's part of the definition of skill in the art that this kind of sequencing would be natural, they call it a detail. They don't even want to defend, and they'll say something, but the fact that a person skilled in the art would know. Their expert said point blank. A person skilled in the art would know when you're comparing one chromosome to another. I would agree. We look at the basida to be able to express what's well known in the art. And perhaps in this case, that could be this translation of this data. But I also believe that there's got to be something in the patent that points to that, something by which we can look at, or someone skilled in the art would look at that and say, okay, here's what you do with the data after the other steps are taken care of, all the way up through C. Here's what you do with the data. Just something. You haven't yet pointed out to that one thing. Right. There is no embodiment of step D that's spelled out. Or language or something. I don't know what language. There's a language that's undisputed that one skilled in the art would know you compare the aneuploidy chromosome count with the control, because you want to see if it's elevated. And the implementation of how you do that for this particular embodiment is not spelled out chapter and verse, but everyone would know because it's a detail. So let's go back to paragraph D. Using the data of step C, and I say, well, what data? Just the identification of the chromosomes, that's it? The chromosome count. We know that's not the case. There's something else that's happening there. No, it's the chromosome count. The count of the chromosomes, which is from 19 and 20. You count up how many hits you're getting for 21. You count up how many hits you're getting for 20. It says identifying chromosomes to which the sequences obtain a step B belong. Yeah, that's the 30-bit. Okay. Then it goes on D. Using the data of step C. Right. Well, there's something that's missing there, isn't there? No. The input is. The quantification of the data is not missing there? Right. Because you're quantifying it based on the 30 in column 20 where you're going, you're taking your sequences, and you're comparing them to the genome, and you're figuring out where they're located from, and you're counting. Yes, the count is there. The issue here is that examples are not required. That's an ARIAD. You don't need to spell it out if people would know. The point of the whole predictability, all the considerations that you're supposed to take into account for a written description from ARIAD, this is really the point. This is the why we win. All those considerations, none of them were made. They said this is totally new without any support. If it was new and unpredictable and you didn't know what you were doing, yes. But you need to take into account predictability. You need to take into account what the actual invention is. None of that analysis was done. Just because an implementation detail on enablement, Your Honor, you keep thinking enablement. Just because it doesn't have an enabling step doesn't mean it's not written described, and the fact that it's so trivial tells you that's not a written description violation. Given the time, I'd like to, I guess, reserve unless there's a question, which I'd be happy to. Okay. Thank you. Thank you, Your Honor. May it please the Court, the Board did not hang its opinion really on CentiCorps. It hung its opinion on a factual finding that this patent specification did not describe this claimed method as a unified whole. And they said that at appendix page 15. And that fact finding is supported by substantial evidence. Did the Board find that the specification discloses steps B and C? It did not. And this is a point of dispute. It says pretty clearly that elements of the claims are described, and it's clear what those are. It describes MPS, not random MPS, as my learned brother said. It describes in a different paragraph that 30 base pairs of random sequence can identify a chromosome, but goes on in the rest of the paragraph to identify, to describe how you use that to identify sequence-specific primers and probes. In other words, for targeted use. This is much like FW. Before you go any further, that statement in column 20 about using 30 base pairs of sequence information to associate or identify a chromosome, does that statement work in both the random sequencing context and a targeted sequencing context? It would, but the context in which that statement appears in this specification is relating to the identification and preparation of sequence. And you can see that the next article down that's discussed is about designing primers and things like that. And the point is this is a lot like FWP v. Biogen, 749 Fed Appendix 969, admittedly an unpublished case, but a guide to the path to decision here. That was one of these cases where all the words could be found somewhere in the specification, and the late claimer came in and tried to assemble them the way that the patent owner had. And what the court said, what the board said and the court affirmed, you may have those words, but you didn't describe this method as a unitary whole. And that was really the first point that the board made. What are you saying is missing in the description of the method as not being unitary? What's missing is a description that the data is generated by random MPS, that that data is then normalized as is required in random MPS, but not in targeted MPS. The normalization step. Normalization is the critical step that's missing. So if we do find in the patent references to the normalization process, is that sufficient to prompt a procedure to say, based on my own knowledge and skill in the art, I now have a prompt within the patent that prompts me to know that I have to undertake this normalization step. Well, I don't believe there is any reference to a normalization step. Let's look at the Belsus-Brabian reference. Certainly. And paragraph 71 and 72. And there it speaks about images and other information, about reducing noise. The computer program can perform optional alignment between images, extract a single molecule of data, correlate the data between the images and cycles, and specify the DNA sequence from the patterns of signals. Isn't that a reference to normalization? No. Why? The Belsus-Brabian is detecting single nucleotide polymorphisms, or SNPs. All he's interested in is whether what he's found differs in one nucleotide from what can be found in the genome. And this is described in Dr. Gabriel's declaration, paragraph 65 at 3717 of the appendix, that he is not counting the number of sequences from specific chromosomes, or normalizing those counts based on differences in chromosome size. That's her testimony about Belsus-Brabian. And the other point about Belsus-Brabian, which is in paragraph 67 of her declaration at 3998-99, she points out that Belsus-Brabian does it two ways. He can do it with the naked DNA, which would be random sequencing, or he can do it with PCR-amplified DNA, which is a target-specific method. So when you ask, well, why was that cited there? First of all, the sentence it's attached to just talks about four-color sequencing. And Belsus-Brabian does describe four-color sequencing in paragraph 64 of that application. And the reader is going to think that's all it's being cited for. But it isn't any better than the reference to the Illumina machine. And the testimony was clear. The Illumina machine could be used either for targeted sequencing or for random sequencing. And the entire thrust of this application, as the court has noted, is all about targeted sequencing. Targeted sequencing and its analysis step, there's an elegance to it. The analysis step can look just to this one-to-one ratio between the number of targeted sequences for one gene and the number for the other. But when you use random sequencing, you can't do that. And there's no description in this patent that that one-to-one computation method doesn't apply to some embodiments of the invention. And, frankly, a person's skill... Why wouldn't a person's skill in the art come to this patent with that knowledge already? The person would come to the patent and read the patent to understand what the inventor had invented and described. And... Do we allow, at that point, the person's skill in the art to fill in blanks? Not in the description. In... If the issue is one of enablement, then certainly you need not relate what people already know in terms of enablement. But when the issue is written description, Ariad makes clear that's within the four corners of the patent specification. And the point here is... But written description isn't like a demand of an engineering specification where you have every single little itty-bitty detail all laid out in punishing detail. Correct. That's not necessary. I'm not suggesting that. There were two ways that they could have communicated to the reader here that they had in mind massively parallel sequencing of random DNA. They could have... To detect aneuploidy. To detect aneuploidy. They could have said that. Or they could have identified, when you do that, you need to normalize. In other words, a difference in the entire approach. And they claim... Okay. So just so I understand, to follow up on something Judge Rainer asked earlier, if this specification, perhaps after the citation to the Bala-Sabra-Manyan reference, had said, now go ahead and normalize that data that you're generating, then necessarily, even though the specification still wouldn't say altogether the magic words, random NPS, by deduction, by necessary implication, it's now talking about random NPS. Is that fair to say? I think there would still be an issue as to whether this method was really described as a unitary whole. Because normalization isn't used for targeted sequencing, right? Correct. So then what else could it be talking about if the specification had talked about normalization in relation to Bala-Sabra-Manyan? It would be a good indicator that there was a discussion, that they were talking about random sequence information. All I'm suggesting is that the way the specification is written, there's nothing that causes you to pull out Bala-Sabra-Manyan and read it. It says, see also for four-color sequencing. And one wouldn't expect you would footnote your way into a written description of an invention. And we're blessed here. We've really got some evidence in this record of what people who actually made this invention thought you needed to say. And there are two applications in the appendix. One is Lowe's application, the involved application that starts at A4013. The other is Quake's 415 patent provisional application, which starts at page 4165. And one is Lowe's application describing random MPS, and the other is Quake's first filed application describing it. And they all do three things. Lowe expressly discloses random MPS for aneuploidy at paragraph 110. It identifies the marked contrast between the targeted method and the random method at paragraph 112. And it identifies the need to normalize random data at paragraphs 80 through 81. And the Quake provisional application, similarly, expressly discloses random MPS for aneuploidy at paragraphs 33 and 70, expressly describes normalization at paragraphs 28, 54, and 70, describes the important difference between random sequencing, which uses all of the data in the sample, and digital sequencing, which looks only at targeted sequences, and how that gives you more accurate results in paragraphs 10 and 42. And most importantly here, it makes specific reference to the specification that's now in the Quake 018 involved patent. And it says it describes using digital PCR for aneuploidy. There's no recognition that it disclosed anything more. And that tells... Is random... Excuse me. Is normalization of data required where you have random sequencing? I'm sorry? Is it required? Yes, is it required? To do aneuploidy counting, yes, it is. You don't need it if all you're doing is looking for single nucleotide polymorphisms as Balasubramanian was. So why is this an issue coming up now? I mean, why weren't these arguments made to begin with? It seems to me that the party should have known when you presented yourself the first time to this court, and I was on that panel, the party should have made these arguments as in the alternative. Well, I mean, with respect, the whole point was that there was nothing in this application that specifically focused on random MPS. Yes. And they said, oh, there is, there's this Illumina. We reversed on that and we sent it back down. And the board said, look, Illumina can be used both ways, so it isn't specifically MPS. So this argument that is now being made here that, oh, everybody would recognize the instant I said 30 base pairs of random sequence can identify a chromosome, even though it's in a paragraph talking about making reagents for targeted detection, they would immediately know everything you're supposed to do. That's the wrong issue. The issue is reading the specification as a whole, would a person of ordinary skill in the art recognize that even though they didn't describe it, didn't come right out and describe it the way everybody else did, they nonetheless had invented the method that they're now claiming. And the answer there is without acknowledging that this very elegant one-to-one comparison method that they describe doesn't work for random, that you need normalization there. Without that, the person skilled in the art would not recognize that this pile of words here is intended to be a description of random MPS. And that basically is what the board found the first time and found in more detail in accordance with the court's helpful guidance and instruction this time around. I'd like to address the question of the prior art. There is evidence here. First, the fact that a person skilled in the art might have been able to do normalization if you had told them to do it, if it were described is not the point. And Ariadne's clear on that, that a person of ordinary skill in the art would have been able to practice the invention had it been described as not determinative of the adequacy of description. The description has to be within the four corners of the application and it must be of something that is not something that merely renders the invention obvious. And that's really what Quake is arguing here is, oh, from what I did write, these couple of words that I had that I've now pulled together in light of what Lowe actually claimed, a person skilled in the art would be able to practice it. Now, they rely on Capon v. Escher for this idea that, well, you can look to the prior art for these matters. Capon dealt with not having to repeat known DNA sequences. But more importantly here, there is testimony here from Dr. Gabriel at paragraph 19 on 5761 that random MPS was not being used for diagnostic purposes in 2006 and 2007. And such diagnostic approaches were then in early development. So this prior art was not so gloriously fully developed that all that needed to be recited was, oh, go count the chromosomes. And on that point, this is not, and the argument was made here the last time too, they want to genericize the claim. Oh, it's just counting chromosomes by whatever method. That's not the claim that's here. They had presented a generic claim like that as Quake claim 25 at appendix 4136, and it is not in the patent. This is a very specific claim to a very specific species of aneuploidy detection, which is a species that is not described in this patent application. Thank you very much. Thank you, sir. Counselor Reynolds. Thank you, Your Honor. You've got two minutes. Thank you. That argument was very disturbing. The gist of it was that the patent discloses targeted sequencing, not random sequencing. Judge Chen specifically asked counsel whether the section in 20 that I pointed out before, 3 regarding the only 30 base pairs of random information, and said that that was a finding of targeted sequencing. He asked him if it could be used in targeted, and he told you that the board found that that was for targeted sequencing for primer making. Here at appendix 14 to 24, passage B expressly recites random sequence information accordingly, even if the references that follow are not relevant to random sequence information. We find that passage B does expressly describe random sequencing. So the board found that 19 and 20 disclosed random sequencing. That was most of the argument, Your Honor. Now, on normalization, let me be clear about one thing. For any kind of Down syndrome test, whether it be targeted, any way you do it, when you're taking one-to-one, you still have to clean up the data. It's not like normalization is just one thing you do to clean up the data. It's not like you just, in targeted sequencing, you're just done. So there's no written description of that either, because you don't go through all the natural cleanup you do, because people know. Now, as to normalization, two critical points. Where's the cleaning up described in claim one of the 18th patent? I'm sorry, what's that? Where's the cleaning up described? It just says you compare one to the other. It's an enablement. That's not cleaning up. I mean, you're talking about something else. You compare data from one to the other, and you have to clean it up. But that's what's missing here. It's missing for every single thing. Then the entire patent is not written described, because every time you do the statistical analysis, you obviously aren't just putting two numbers out there. But the point I want to make is their expert, and just indulge me in this, two quick points. Their expert admitted that one skilled in the art would know how to take into account the size of the chromosome. This is at 15981. But this was certainly well-known at the time, how you do that, right, in February of 2007. To take into account the size of the chromosome and to create a normalized frequency with that information, I think someone could have done that, yes. So people would know how to do it. It's a detail. They call it a detail. So they would know it. You're out of time. Can you conclude? Yes. Just the second piece to that is it's undisputed that they would know that you need to do that. The other side repeatedly said this, and I'll just give you the sites, A5768 and A4010. Their own expert said, persons skilled in the art confronting this would know that you couldn't use one-to-one because you had to normalize. Well, they would know you have to do that. They would know how to do it. That's not a wish or a plan, anything like Senator Cora Lilly. It's a misapplication of Marriott. Thank you very much. We thank the party for the arguments. This court is now in recess. All rise.